**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

| | | |
|---|---|---|
| ROBERT R. WALLING, by | ) | CASE NO. 8:24-cv-05223-BHH |
| His Attorney-in-Fact, MICHAEL | ) | |
| WALLING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **RESPONSE IN OPPOSITION TO** |
| | ) | **BANK OF AMERICA, NA ("BANA")** |
| BANK OF AMERICA, NA ("BANA") | ) | **MOTION TO DISMISS FIRST** |
| | ) | **AMENDED COMPLAINT** |
| Defendant. | ) | |

Plaintiff, Robert R. Walling, by his Attorney-in-Fact, Michael Walling ("Plaintiff" or

"Walling"), submits the following Response in Opposition to Bank of America, NA's ("BANA")

Motion to Dismiss First Amended Complaint ("the Complaint") (Docket Entry No. 23).

## I. INTRODUCTION

This case involves unauthorized electronic fund transfers from the account of BANA's

elderly customer, Robert Walling.  Despite BANA's knowledge that customers such as Mr.

Walling are specifically targeted for scams and thefts, the widespread existence of these scams,

and multiple red flags indicating fraudulent activity in the account itself, BANA did not identify,

intercept, or investigate these transfers, causing a loss of $179,500.00 to Mr. Walling. After Mr.

Walling's son (and attorney-in-fact Michael Walling) disputed the transactions to no avail, this

action was filed to require BANA to honor its responsibilities under federal and state law.

In its Motion to Dismiss, Defendant argues that it bears no responsibility for its own

alleged failures, and that Mr. Walling must bear the loss for transfers he neither made nor

authorized.  Defendant's motion should be denied because Plaintiff has sufficiently stated claims

under the Electronic Fund Transfers Act (EFTA), South Carolina's Omnibus Adult Protection Act, and South Carolina UCC Article 4A.

## II. FACTS IN THE COMPLAINT

At the time of the unauthorized transactions, Plaintiff was 83 years old and a longtime customer of BANA. (Amended Comp. ¶ 7). In early 2024, he became the victim of multiple unauthorized electronic fund transfers from his BANA account. *Id.* The unauthorized transfers were initiated electronically through BANA's online banking platform or mobile app, which Plaintiff used on his iPad. (¶ 8). Plaintiff alleges, upon information and belief, that his iPad was compromised, letting criminals gain access to his BANA account on the iPad through the application "AnyDesk" and execute the unauthorized transfers (¶ 9).

From January 16, 2024, to February 5, 2024 – just 20 days -- at least thirteen (13) significant unauthorized transfers were made from his account. (¶ 12). Each of the fraudulent transactions was in whole numbers. *Id.* Twelve of the thirteen fraudulent transactions occurred in increments of one thousand dollars, ranging from a low of $10,000.00 to a high of $20,000.00. *Id.* Only one transaction (the first) was for less than $10,000.00.[1]  *Id.* The total of all thirteen fraudulent transactions taken from Mr. Walling's BANA account was **$179,500.00.**  (¶ 13). It was a catastrophic loss for almost any retired senior citizen, and one that was easily preventable to any bank that cared enough to pay attention.

None of the unauthorized transactions remotely followed Plaintiff's previous banking activity, and they all should have been detected by BANA's systems. (¶ 15). However, not a single transaction was flagged, intercepted, or challenged. When Mr. Walling's son (and his

---

[1] In fact, twelve of the thirteen transactions were above the $10,000 threshold that would require the filing of Currency Transaction Reports, and potentially Suspicious Activity Reports under the Bank Secrecy Act.

attorney-in-fact) Michael, learned what had happened to his father and notified BANA about the fraudulent transactions, BANA took no action to remedy the situation, investigate it meaningfully, or issue any provisional credits to his account. (¶ 17).

As set forth in the Amended Complaint, BANA should have recognized these transactions were not allowed and flagged the account due to their inconsistency with Plaintiff's typical banking behavior, the amounts involved, the names of the payees, and the clear pattern of fraud. (¶ 18). The transactions involved high frequency and high-value transfers to multiple beneficiaries over a short period and were made to a total of five payees with names like "Yuanming Tao," and "Vanessa Cool Limited" who, on multiple occasions, took more than $30,000 in a single day. (¶ 12).

Despite these red flags, notification from Plaintiff's attorney-in-fact, and the obvious anomalies, BANA did nothing.  Even after being notified, BANA issued no credits to Mr. Walling. Instead, BANA simply denied his dispute. (¶ 20).  Plaintiff alleges that BANA did not conduct the requisite good faith investigation into what was the very definition of "suspicious" and lacked a reasonable basis for finding that the no fraud had occurred. (¶ 21).  Instead, BANA knowingly and willfully concluded that the withdrawals were not in error, a conclusion that could not have been reasonably drawn from the available evidence. (¶ 22).  These actions violate multiple provisions of the federal Electronic Fund Transfer Act (EFTA) as well as South Carolina law.

Thus, Plaintiff states three claims in his Amended Complaint: 1) violation of the Electronic Funds Transfers Act (¶¶ 23-31), 2) participation in the financial exploitation of a vulnerable adult in violation of S.C. Code § 43-35-5 et seq. (¶¶ 32-40), and 3) violation of South Carolina UCC Article 4A (¶¶ 41-49).

3

### III. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses"). To be legally sufficient, a pleading must have a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

A motion to dismiss under Rule 12(b)(6) for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support her claim and would entitle her to relief. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a motion to dismiss, the court should accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999); *Mylan Labs., Inc.,* 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must treat the factual allegations of the nonmoving party as true. *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 217-18 (4th Cir. 1994).

### IV. ARGUMENT

**A. Plaintiff states a claim for violation of the Electronic Fund Transfers Act.**

BANA begins by making the blanket assertion that the Electronic Fund Transfers Act

("EFTA") and Regulation E (which implements EFTA's consumer protections and bank responsibilities) is inapplicable whenever a transaction involves a wire transfer. This is patently wrong. As the CFPB has reiterated just this year, "[*w]hen a bank connects wire transfer capabilities to its online consumer banking platform and a person authorizes (or a scammer purports to authorize) a transfer online, the Electronic Fund Transfer Act applies to the transaction except for the bank-to-bank [wire] portion of it*." See, CFPB, Frotman, "*Banks' Responsibility for Scams,*" May 29, 2024.  (Docket Entry No. 27-1, emphasis added).[2]

> **1. The History of EFTA shows the Act applies to the "non-wire" parts of a transaction.**

EFTA was enacted in 1978 primarily to provide consumers with individual rights in the then fledgling area of electronic fund transfers. 15 U.S.C. § 1693. Among other protections, EFTA and Regulation E provide important consumer safeguards from unauthorized electronic fund transfers, including "a transfer from a consumer's account initiated by a person other than the consumer without actual authority to initiate the transfer and from which the consumer receives no benefit." 12 CFR 1005.2(m).[3] When consumers promptly tell their financial institution about an unauthorized transfer, Regulation E caps the consumer's losses at $50 (or a

---

[2] The Consumer Financial Protection Bureau (CFPB) has rulemaking authority over the Electronic Fund Transfer Act (EFTA) under the Dodd-Frank Wall Street Reform and Consumer Protection Act, and is charged with interpreting and implementing Regulation E.

[3] And when a consumer's account access information is obtained from a third party through fraudulent means such as computer hacking, and a hacker uses that information to make an EFT from the consumer's account, the transfer is an unauthorized EFT under Regulation E.  See, *CFPB Electronic Fund Transfers FAQ's. Version 2*, 2021.  (FAQ's attached as exhibit, Docket No. 27-2).  The CFPB has also made clear that "unauthorized" transactions include situations where "a third party using phishing or other methods to gain access to a consumer's computer and observe the consumer entering account login information.  EFTs stemming from these situations meet the Regulation E definition of unauthorized EFTs." Id.

maximum of $500.00), and require the financial institution to investigate, and mandate that the financial institution provisionally credit the consumer's account if that investigation takes longer than 10 days. See id. § 1693g; 12 C.F.R. §§ 1005.6, 1005.11.

EFTA defines an "electronic fund transfer" as "***any*** *transfer of funds ... which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account*." 15 U.S.C. § 1693a (7) (emphasis added).  EFTA has a few exclusions, including a "*transfer of funds ... **made by a financial institution** on behalf of a consumer by means of a [wire] service*." Id. § 1693a(7)(B) (emphasis added). And as the Senate Report at the time of EFTA's passage recognized, this exclusion applies to "traditional 'wire' transfers between banks," S. Rep. No. 95-915, 4, 8 (1978), because only the transfer of funds between banks occurs "by means of a [wire] service."

Of course, the financial landscape has changed dramatically since EFTA's enactment in 1978.  Before EFTA (and until the advent of online consumer banking), wire transactions made by consumers were rarely – if ever -- initiated by means that qualified as an "electronic fund transfer" subject to the EFTA.  Rather, a consumer wanting to make a wire transfer would commonly have gone in person to a bank branch to make a written or verbal request for the bank to make the wire. Such a verbal or written "initiation" of the transaction would not satisfy the definition of an "electronic" fund transfer and would be covered by the UCC and its Article 4A.[4]

However, as banks continued to modernize and offer more methods for conducting personal banking, they expanded the consumer's ability to electronically authorize, and initiate

---

[4] Unlike EFTA which is manifestly a consumer protection statute, the UCC applies equally to commercial and consumer transactions and, while it requires that a bank may be held liable for failing to act in good faith, or follow reasonable procedures, it has no limitations on consumer liability.

transfers conducted in part via a bank-to-bank wire transfer.

Thus, since 1996, EFTA's implementing Regulation E has specifically addressed the circumstance when an electronic fund transfer includes a transfer by wire service. According to Regulation E's official commentary: "[t]he portion of the fund transfer that is governed by the EFTA is not governed by subpart B of the Board's...Regulation J, as outlined in 12 C.F.R. pt. 1005, Supp. I, cmt. 3(c)(3)-2, So "if an institution offers consumers the ability to initiate Fedwire transfers pursuant to a telephone transfer agreement, the transfer could be covered by both Regulation E and Article 4A." 61 Fed. Reg. 19678, 19680 (May 2, 1996). In the same way, "if a financial institution makes a fund transfer to a consumer's account after receiving funds through Fedwire or a similar network, the transfer by ACH is covered by [Regulation E] even though the Fedwire or network transfer is exempt." Id. at 19687; see also 12 C.F.R. pt. 1005, Supp. I, cmt. 3(c)(3)-1. But the CFPB did not consider Article 4A as applying end-to-end, because that would risk "subjecting consumers to full liability for unauthorized transfers merely because some part of the transfer, which would ordinarily be covered by Regulation E, is made via Fedwire." 61 Fed. Reg. at 19679-80.

Finally, Regulation J, which governs Fedwire, also recognizes that the EFTA covers some portion of a transaction that includes a wire transfer. In 1990, when the CFPB amended Regulation J, it pointed out that "a funds transfer to a consumer beneficiary could be carried out in part through Fedwire and in part through an automated clearing house or other means that is subject to the Electronic Fund Transfer Act or Regulation E." 55 Fed. Reg. 40791, 40804 (Oct. 5, 1990). For these "hybrid" transactions, Regulation J "governs a funds transfer that is sent through the Fedwire Funds Service" while "the portion of such funds transfer that is governed by the Electronic Fund Transfer Act . . . is not governed by [Regulation J]." 12 C.F.R. §

210.25(b)(3).

**2. The transactions in this case were each initiated electronically via BANA's online platform and are "hybrid" transactions where the electronic initiated preceded the wire.**

The Plaintiff alleges in his Amended Complaint that the unauthorized transactions were *initiated electronically* via BANA's online banking platform or mobile app, before being processed as wire transfers. (Amended Comp., ¶ 25). The Plaintiff further specifically alleges that BANA then executed an intra-bank electronic fund transfer that debited his account, and then transferred the funds to a pooled account. Only after this initial electronic fund transfer was complete did BANA transmit the funds via wire service to another bank. *Id.*

According to the CFPB's interpretation and all of the other authority referenced above, this initial electronic fund transfer from the Plaintiff's account to BANA's pooled account qualifies as an "electronic fund transfer" under the EFTA, distinct from the subsequent wire transfer between banks, and is covered by EFTA and Regulation E. Thus, while the ultimate specific wire transfer part is excluded from EFTA coverage, all other elements of each of the 13 transactions fall under EFTA's coverage.[5]

Against the weight of these 34 years of consistent interpretations supporting EFTA coverage, comes BANA's contention that the CFPB's interpretation is "incorrect and unsupported." In essence, BANA asks the Court to instead adopt its own (unofficial)

---

[5] In attempting to deal with the weight of interpretive authority, BANA in its memo tries a bit of misdirection, arguing that Congress has "repeatedly declined to amend the EFTA to bring all wire transfers within its coverage." However, again, the Plaintiff has not argued that the wire transfers themselves are covered by EFTA; rather, he is stating simply that the <u>non-wire transfer aspects of the transactions</u>, including the initiation of the transfers through Defendant's online system, are clearly covered.

"interpretation," i.e., that a wire touching any stage of the transaction is a sort of "third rail" that extinguishes all consumer rights under EFTA -- even where money is stolen from that consumer via a computer hack and made using the Bank's own electronic platform. Such an interpretation not only undermines the very protections EFTA was passed to safeguard but renders every consumer's life savings fair game to remote criminals (even where the bank's own "protection" systems fail completely).

BANA acknowledges that the CFPB's position is being challenged by another financial institution, Citibank, in the Southern District of New York in the case of *People of the State of New York v. Citibank*, N.A., Civil Action No. 1:24-cv-00659-JPO (S.D.N.Y. Jan. 30, 2024). That action was brought by the State of New York against Citibank on behalf of victims like Plaintiff for Citibank's attempt to evade EFTA requirements whenever a wire was implicated.  Over Citibank's similar claims that it has no responsibilities under EFTA for these transactions, both the State of New York and the CFPB have reaffirmed the opposite view of the CFPB's interpretation. (See, CFPB Proposed Statement of Interest in the above case, Docket No. 27-3). Like Citibank, BANA asks this Court to adopt *its own* preferred interpretation instead of the official interpretation of the federal agency with supervisory authority over BANA.

Scrambling for caselaw to support its argument, BANA offers two non-binding rulings from District Courts in Utah and Connecticut to claim that "courts have already rejected Plaintiff's contention that wire transfers are bifurcated into two transfers."  Not only do both of these decisions predate the CFPB's 2024 statements but one of them, *Spain v. Union Trust*, 674 F. Supp. 1496, 1499-1500 (D. Conn. 1987) **predates electronic banking** – including BANA's first use of it – by a decade.  And even assuming BANA's characterization of those non-binding rulings were correct, such decisions contradict Regulation E's explicit language, which expressly

9

allows for a transfer to be governed by both Regulation E and Article 4A. 61 Fed.Reg. 19678, 19680 (May 2, 1996).

Under the clear weight of the above authority, then, including by the agency charged with interpreting Regulation E and supervising BANA, the CFPB, Defendant's Motion to Dismiss Plaintiff's EFTA claim should be denied.

**B. Plaintiff has stated a claim for violation of South Carolina's Omnibus Adult Protection Act, S.C. Code Ann. § 43-35-5 *et seq.***

The Omnibus Adult Protection Act ("the Act") protects vulnerable adults from abuse, neglect, and exploitation. 1993 Act No. 110, § 1, codified as S.C. Code Ann. §§ 43-35-5 to -595 (Supp. 2007).  The Act defines a "vulnerable adult" as

> [A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection. This includes a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including, but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction. A resident of a facility is a vulnerable adult.

S.C. Code Ann. § 43-35-10 (Supp. 2007).

The Act contains a list of required reporters, but the Act also requires reporting by "any other person who has actual knowledge that a vulnerable adult has been abused, neglected, **or** exploited." S.C. Code Ann. § 43-35-25(A).  The Act further encourages voluntary reporting by "any other person who has reason to believe that a vulnerable adult has been or may be abused, neglected, or exploited may report the incident." S.C. Code Ann. § 43-35-25(B).

"By its clear terms, the infirmities of aging must 'substantially impair' the person's ability to adequately provide for his or her own care or protection." *Doe v. S.C. Dep't of Soc. Servs.*, 407 S.C. 623, 634, 757 S.E.2d 711 (2014).  "[F]or a person to be deemed a vulnerable adult

under the Act [,] the person's physical or mental condition, including advanced age, must cause a diminished ability to adequately provide for self-care or protection." *Id*. at 635, 757 S.E.2d at 718.

The Act further has provisions prohibiting financial exploitation.  S.C. Code Ann. § 43-35-87.  That section provides authority for financial institutions to decline, or put a hold on, transactions if the financial institution has reason to believe that elder financial exploitation is occurring or about to occur.  S.C. Code Ann. § 43-35-87(B).

Here, Plaintiff has alleged that at the time of the transactions, he qualified as a vulnerable adult due to his advanced age of 83 years and his inability to adequately provide for his own financial protection.  (Amended Comp. ¶ 33).  Plaintiff alleged that BANA, through its actions and failures to act, participated in and materially aided the financial exploitation of Plaintiff.  *Id*., at ¶ 36.  Plaintiff alleged that without Defendant's actions and failures, the financial exploitation could not have occurred.  *Id*.  Plaintiff alleged that Defendant did not exercise its duty to protect Plaintiff from known and easily recognizable patterns of financial exploitation, such as high-frequency and high-value wire transfers to multiple beneficiaries over a short period.  *Id*., at ¶ 37.

In response, Defendant argues:  1) there is no private right of action under S.C. Code Ann. § 43-35-87; and 2) Plaintiff has not sufficiently alleged that he was a vulnerable adult as defined therein.

### 1.     A private cause of action exists under § 43-35-87(H).

First, BANA claims there is no private cause of action under § 43-35-87(H).  Defendant cites no case law or other support for its position, but simply quotes the provisions of § 43-35-87 and asks this Court to identify legislative intent by "look[ing] first to the language of the statute." According to § 43-35-87(H):

11

If the determinations and actions of a financial institution or an employee of a financial institution are made in good faith and in accordance with the provisions of this section, then the financial institution or employee shall be immune from criminal, civil, or administrative liability for declining transactions to disburse monies pursuant to this section, and for taking actions in furtherance of a determination, including making a report or providing access to or copies of relevant records to an investigative entity or law enforcement agency. ***Nothing in this section is intended to nor does it limit or shield in any manner a financial institution from civil liability against any claim***, including reasonable attorneys' fees, costs, and litigation expenses, for participating in or materially aiding the financial exploitation of a vulnerable adult. Any such claims shall be asserted by the vulnerable adult, or on his behalf by an appropriate guardian or representative who is not involved in or otherwise suspected of participating in the financial exploitation of the vulnerable adult, by filing a civil action in circuit court.

According to its express language, this provision is neither intended, nor does it act, as a shield "in any manner" against a claim for participating in, or materially aiding, the financial exploitation of a vulnerable adult. Further, "any such claim shall be asserted by the vulnerable adult, or on his behalf by an appropriate guardian or representative… by filing a civil action in circuit court." *Id*. Plaintiff did just that by filing the initial complaint on August 24, 2024, in the Eighth Judicial Circuit of Newberry County, South Carolina.

If the financial institution shows its determinations and actions were made "in good faith and in accordance with the provisions of this section," it may enjoy immunity from such a civil action. But this does not mean there is no private right of action. It simply provides the financial institution an affirmative defense if such an action is filed. Here, determining whether or not BANA acted in "good faith" has not yet been made (and likely requires discovery to determine). c. Plaintiff's Complaint, the factual allegations of which must be accepted as true for purposes of the Motion to Dismiss, alleges that BANA simply ignored numerous red flags and took no actions at all to stop the financial exploitation from occurring. Plaintiff alleged that the "investigation" performed by BANA was inappropriate and should not have resulted in his

12

dispute being denied.  Whether or not BANA's "investigation" was conducted in good faith is also still to be determined.

Nonetheless, BANA's argument that there is no private right of action under S.C. Code Ann. § 43-35-87(H) is defeated by that provision's own language.[6]

### 2.     Plaintiff has alleged that he was a vulnerable adult.

Next, BANA argues that Plaintiff has not sufficiently pleaded that he was a vulnerable adult at the time of the transactions.  BANA claims that Plaintiff's allegations are "conclusory."

Plaintiff alleged that at the time of the transactions, he was 83 years old and incapable of adequately providing for his own financial protection.  (Amended Comp., ¶ 33).  Even if the Court found that these facts do not satisfy the requirements to be considered a "vulnerable adult" under the Act, the remedy is to allow Plaintiff to amend the Complaint.  At minimum, if the Court agrees with BANA, Plaintiff seeks leave to amend.

### C. Plaintiff has stated a claim for violation of the South Carolina UCC.

UCC Article 4A governs funds transfers, which are defined as "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the

---

[6] Plaintiff argues that there is a private right of action pursuant to S.C. Code Ann. § 43-35-87(H); however, if the Court has questions regarding the intent of the legislature in this regard, Plaintiff respectfully requests that it certify the question to the South Carolina Supreme Court pursuant to Rule 244 of the South Carolina Appellate Court Rules.

beneficiary of the originator's payment order." S.C. Code Ann. § 36-4A-104(a).

As indicated, the transaction begins "with the originator's payment order." *Id*. The "originator" is defined as "the *sender* of the first payment order in a funds transfer." S.C. Code Ann. § 36-4A-104(c) (emphasis added). "Sender" means "the person giving the instruction to the receiving bank." § 36-4A-103(a)(5). Once the "sender" gives instructions through a payment order, that sender then becomes the "originator." The originator's instructions are given to the "receiving bank". § 36-4A-103(a)(4). The "receiving bank" then becomes the "originator's bank" by giving instructions regarding the payment order to the "beneficiary's bank", which is the bank holding the account of the beneficiary. § 36-4A-103(a)(3).

First, BANA argues that Plaintiff's claim under UCC 4A-202 fails because he admitted authorizing the wire transfers. For support, BANA quotes ¶ 10 of the Complaint, which stated: "Upon information and belief, Mr. Walling did himself authorize, make, or participate in the transfers." Thus, BANA posits, Mr. Walling admitted that he "did himself authorize…" the transactions. While BANA correctly quoted ¶ 10 of the Complaint, it is clear from any objective reading of the Complaint that ¶ 10 mistakenly omits the word "not." ¶10 should have read: "Upon information and belief, Mr. Walling did *not* himself authorize, make, or participate in the transfers." This reading follows the repeated allegations in the Complaint that the thirteen transactions were **unauthorized**. *See e.g.* ¶¶ 7, 8, 11, 12, 13, 17, and so forth. Throughout his Complaint, Plaintiff repeatedly alleged that the transactions were not allowed. Despite the mistakenly omitted word "not" in ¶ 10, Plaintiff does not, and did not, admit that he authorized the transactions, when the entire basis of the Complaint is that the transactions were not, in fact, authorized. Lastly, see *Declaration of David A. Maxfield*, confirming that the omitted word was a typographical error. (Docket No. 27-4).

S.C. Code § 36-4A-202(a) requires BANA to exercise ordinary care in executing payment orders, including verifying the authenticity of the payment order and the identity of the receiving bank. Plaintiff alleged that BANA did not act in good faith and consistent with commercially reasonable banking standards. (Amended Comp. ¶ 44). Moreover, Plaintiff alleged that BANA's security procedures were inadequate and not commercially reasonable, as BANA did not detect and prevent the obviously unauthorized transactions despite multiple red flags. *Id*. at ¶ 45. Questions regarding BANA's exercise of ordinary care, and the effectiveness of its security procedures remain, such that dismissal is inappropriate.

Next, Defendant argues that Plaintiff's UCC 4A-211 claim also fails because it could not cancel the payment order after it was accepted. Defendant states that "Article 4A affords Plaintiff no right to cancel wire transfers that had already been completed without the agreement of BANA." But Plaintiff is not only arguing that BANA should have reversed the payments. Instead, Plaintiff has alleged that had BANA followed commercially reasonable banking standards, it would not have let the transactions be processed. Instead, it would have recognized the fraudulent nature of the transactions, each of which obviously contradicted any activity on Plaintiff's account and investigated the transactions on the front end. Doing so would have kept the transactions from even occurring.

Defendant's Motion to Dismiss the UCC Article 4A claim should be denied.

## **CONCLUSION**

For the reasons outlined above, this Court should deny Defendant's Motion to Dismiss in its entirety.

Respectfully Submitted,

DAVE MAXFIELD, ATTORNEY, LLC

s/ David A. Maxfield

_____
Dave Maxfield, Esq., FED ID 6293
P.O. Box 11865
Columbia, SC 29211
(803) 509-6800
(855) 299-1656 (fax)
dave@consumerlawsc.com

December 2, 2024